2025 IL App (1st) 231591-U

SECOND DIVISION
April 29, 2025

No. 1-23-1591

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 12502 (02) |
| | ) | |
| PARIS McGEE, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment.

ORDER

¶ 1   *Held*:   The judgment of the circuit court of Cook County denying defendant's petition for leave to file a successive petition for postconviction relief is affirmed; defendant failed to raise, in his initial petition, the claim that defendant's mandatory life sentence violates the Proportionate Penalties Clause of the Illinois Constitution and fails to make a substantial showing of cause for failing to raise the issue initially; and defendant's claim of actual innocence based on the strength of the eyewitness identification is barred by *res judicata*.

¶ 2   Following a jury trial, the circuit court of Cook County convicted defendant, Paris McGee, of first degree murder on a theory of accountability for the death of Thomas Wortham IV, felony murder of Brian Floyd, a co-offender in the acts leading to Wortham IV's death, and aggravated discharge of a firearm against Thomas Wortham III. At the time of the offense defendant was 20-years-old. The trial court sentenced defendant to natural life imprisonment for the deaths of Thomas Worthan IV and Brian Floyd and a consecutive sentence of four years'

imprisonment for aggravated discharge of a firearm. This court affirmed defendant's conviction and sentence on direct appeal. *People v. McGee*, 2017 IL App (1st) 150838-U (*McGee I*).

¶ 3     Defendant filed a petition for postconviction relief that the trial court summarily dismissed. This court affirmed the summary dismissal of defendant's initial postconviction petition. *People v. McGee*, 2021 IL App (1st) 190362-U (*McGee II*). On June 22, 2023, defendant filed a motion for leave to file a successive petition for postconviction relief on the grounds (1) defendant's sentence violates the proportionate penalties clause of the Illinois Constitution as applied to defendant, and (2) defendant is actually innocent. On August 23, 2023, the trial court denied defendant's motion for leave to file a successive postconviction petition. This appeal followed.

¶ 4     For the following reasons, we affirm.

¶ 5                              BACKGROUND

¶ 6     We previously set forth the evidence adduced at defendant's trial in *McGee I* and again, to the extent necessary, in *McGee II*. We again only set forth the information from the proceedings below necessary to resolve the instant appeal.

¶ 7     Defendant, Toyious Taylor, Brian Floyd, and Marcus Floyd were involved in the murder of Thomas Wortham IV, a Chicago Police Department officer (Officer Wortham) while Officer Wortham was visiting his parents, including his father, Thomas Wortham III, a retired Chicago Police Department officer (Mr. Wortham). Brian Floyed was killed during the crime. Mr. Wortham saw Marcus and Brian Floyd approach his son from around the corner of his home. Brian put a gun to Officer Wortham's head and Marcus pointed his hand at Officer Wortham, but Mr. Wortham could not tell if Marcus had a gun. Mr. Wortham yelled for the men to get away from his son and Brian pointed his gun at Mr. Wortham and told him to get back into the house.

Officer Wortham then shouted "Police" and Mr. Wortham heard gunfire. Mr. Wortham ran into the house to retrieve his gun and told his wife to dial 9-1-1.

¶ 8     After Mr. Wortham ran back outside with his gun he saw a red car in front of his home and the passenger, later identified as defendant, was outside the car yelling "Get in." Mr. Wortham testified that defendant fired a gun at him as the car drove away. Mr. Wortham went back to a car the Floyds were crouching behind and circled around. He saw Officer Wortham's gun on the ground, picked it up, and approached the Floyds. Brian pointed a gun at Mr. Wortham and he opened fire, striking both Brian and Marcus. Police arrived and identified Brian Floyd through his driver's license, which was in his pocket. Police went to Brian's mother's home and told her that her son was dead.  Brian's mother was brought to the scene. A detective interviewed her and as a result began looking for "Paris" and "Luke," a name co-defendant Taylor was known by. When Brian's mother returned home with police, Brian's red car was parked in front of her house.

¶ 9     Police compiled and showed Mr. Wortham a nine-person photo array less than four hours after Officer Wortham was killed. Mr. Wortham identified Brian and Marcus Floyd as the two men who approached his son on the street and identified defendant as the passenger in the red car who shot at him. Approximately one-half hour later Mr. Wortham viewed a second photo array and identified Taylor as the driver of the red car. The following day Mr. Wortham identified defendant and Taylor in separate lineups.

¶ 10    Police recovered pieces of a broken taillight near the scene of the murder that were matched to Brian's car. An autopsy revealed that Officer Wortham had injuries consistent with being dragged by a car. Fibers that could have originated from Officer Wortham's shirt were recovered from the undercarriage of the red car. Forensic testing produced DNA matching

defendant on two cups recovered from Brian's car. Defendant could not be excluded as a contributor to DNA discovered on the car's steering wheel. Police also found defendant's fingerprints on the outside rearview mirror and driver's side front door frame of Brian's car, and on a plastic compact disc sleeve recovered from the interior of the car.

¶ 11 As it pertains to this appeal, defendant argued on direct appeal from his conviction and sentence "that: (1) [Mr. Wortham's] identification of him is unreliable given the circumstances under which [Mr. Wortham] observed the man standing by the passenger side of the red car, (2) trial counsel was ineffective in failing to call an expert witness to testify about factors that affect the reliability of eyewitness identification where counsel's trial strategy was to attack [Mr. Wortham's] identification." *McGee I*, 2017 IL App (1st) 150838-U, ¶ 14. Specifically, defendant argued on direct appeal that "the circumstances under which [Mr.] Wortham observed the man standing on the passenger side of the car, the fact only one other person in the photo array matched his initial description of that man, and that only one person was in both the photo array and physical lineup render [Mr. Wortham's] identification of defendant unreliable and raise a reasonable doubt of his guilt." *McGee I*, 2017 IL App (1st) 150838-U, ¶ 16. Defendant also argued that the presence of the gun negatively impacted Mr. Wortham's ability to make a reliable identification (*McGee I*, 2017 IL App (1st) 150838, ¶ 20) and that "there is a low correlation between a witness's confidence in an identification and the accuracy of that identification" (*McGee I*, 2017 IL App (1st) 150838-U, ¶ 21). This court concluded that,

> "the trier of fact heard the circumstances of [Mr. Wortham's] identification of
> defendant and observed his demeanor when identifying him in court and
> testifying as to his prior identifications. The weight to be given his testimony
> based on his level of certainty was for the trier of fact and we will not substitute

our judgment for theirs where, as here, defendant has failed to show the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *McGee I*, 2017 IL App (1st) 150838-U, ¶ 21.

¶ 12    This court rejected defendant's argument that the lineup was impermissibly suggestive (*id*. ¶ 23), and this court also found "defendant's argument that [Mr. Wortham's] identification is questionable 'given the lack of additional evidence that directly implicates McGee in the offense' unpersuasive." *McGee I*, 2017 IL App (1st) 150838-U, ¶ 24. We found that physical evidence did corroborate defendant's participation in the crime. *Id.*

¶ 13    As for defendant's claim on direct appeal of ineffective assistance of counsel, we began by noting that, "In *People v. Lerma*, 2016 IL 118496, ¶ 24, our supreme court recognized that [by then] scientific research concerning the reliability of eyewitness identifications is 'well settled, well supported, and in appropriate cases a perfectly proper subject for expert testimony.' " *McGee I*, 2017 IL App (1st) 150838-U, ¶ 27. Our supreme court in *Lerma* found that the trial court in that case abused its discretion in denying a request to present expert testimony on the topic of memory and eyewitness identification. *McGee I*, 2017 IL App (1st) 150838-U, ¶ 27 (citing *Lerma*, 2016 IL 118496, ¶ 32). Our supreme court found that the trial court abused its discretion "because it denied the defendant's request 'to present relevant and probative testimony from a qualified expert that speaks directly to the State's only evidence against him, and [did] so for reasons that are both expressly contradicted by the expert's report and inconsistent with the actual facts of the case.' " *McGee I*, 2017 IL App (1st) 150838-U, ¶ 27 (quoting *Lerma*, 2016 IL 118496, ¶ 32). In *Lerma*,

"The expert's testimony would include 'the following scientifically documented findings, all of which are beyond the common knowledge of the

average layperson: that the witness's level of confidence does not necessarily correlate to the accuracy of the identification; that numerous factors can undermine the accuracy of an eyewitness's identification, including the stress of the event itself, the presence of a weapon, the passage of time, the "forgetting curve," the wearing of partial disguises such as hoods, exposure to postevent information, nighttime viewing, and suggestive police identification procedures; that eyewitnesses tend to overestimate time frames; and that cross-racial identifications tend to be less reliable than same-race identifications.' " *McGee I*, 2017 IL App (1st) 150838-U, ¶ 27 (quoting *Lerma*, 2016 IL 118496, ¶ 8).

¶ 14 In *McGee I*, defendant argued that,

"[t]he factors impacting the reliability of eyewitness identification defendant argues are present in this case, making expert testimony 'relevant and appropriate,' are that (a) this was a high-stress situation, (b) [Mr. Wortham] was confronted with multiple weapons, (c) there was no evidence [Mr. Wortham] had ever seen defendant before, and (d) the State relied on [Mr. Wortham's] confidence in his identification." *McGee I*, 2017 IL App (1st) 150838-U, ¶ 28.

¶ 15 This court found that defendant failed to demonstrate that trial counsel's performance fell below an objective standard of reasonableness. *McGee I*, 2017 IL App (1st) 150838-U, ¶ 30. We noted that trial counsel attacked Mr. Wortham's identification of defendant based on the stressfulness of the situation, that Mr. Wortham would be focused on the two people Mr. Wortham believed to be armed, and the suggestiveness of the photo array and lineup. *McGee I*, 2017 IL App (1st) 150838-U, ¶ 29. This court acknowledged that "it is possible expert testimony may have aided defendant" (*McGee I*, 2017 IL App (1st) 150838-U, ¶ 30), but found that

counsel's performance was not constitutionally deficient because trial counsel "subjected the State's case to meaningful adversarial testing through cross-examination and argument on the issue of identification" (*McGee I*, 2017 IL App (1st) 150838-U, ¶ 30). We noted that our supreme court "did not hold expert testimony is *required* in every case where the 'factors *** identified as potentially contributing to the unreliability of eyewitness testimony' are present." (Emphasis in original.) *McGee I*, 2017 IL App (1st) 150838-U, ¶ 30 (citing *Lerma*, 2016 IL 118496, ¶ 26). In finding no deficient performance, we also relied on the fact that "this case is distinguishable from the situation presented in *Lerma* because, despite defendant's protests, [Mr. Wortham's] eyewitness identifications are not the 'only evidence of defendant's guilt.' " *Id.*

¶ 16    On October 24, 2018, defendant filed an initial petition for postconviction relief. The only claim in defendant's initial postconviction petition was that "trial counsel rendered ineffective assistance when counsel failed to investigate and present testimony from an alibi witness." *McGee II*, 2021 IL App (1st) 190362-U, ¶ 2. The trial court summarily dismissed the petition on the grounds "defendant failed to show a reasonable probability that the outcome of trial would have been different had counsel called [the] witness, and that defendant was unable to demonstrate it was arguable that counsel's performance was objectively unreasonable." *McGee II*, 2022 IL App (1st) 190362-U, ¶ 22. This court affirmed the summary dismissal, finding that defendant's allegation of ineffective assistance of his trial attorneys was without arguable merit and contradicted by the record. *McGee II*, 2022 IL App (1st) 190362-U, ¶¶ 31, 36.

¶ 17    On June 22, 2023, defendant filed a motion for leave to file a successive postconviction petition. Defendant's motion states that defendant asserts two claims in the proposed successive petition:

"a. [Defendant] asserts that his sentence, as applied, violates the Proportionate Penalties Clause of the Illinois Constitution. [Defendant] was given a mandatory life sentence, while a young adult, and convicted on the basis of accountability.

b. [Defendant] asserts he is actually innocent for the crime for which he was convicted. [Defendant] includes a report from an eyewitness identification expert which supports his innocence."

¶ 18    Defendant's motion argues defendant has cause for failing to raise his claim that his sentence violates the proportionate penalties clause sooner because "(1) the science involved was still being developed and recognized by the courts, and (2) the case law which stated that a proportionate penalty claim in such instances was properly filed in a postconviction petition was not available at the time of the initial petition." In support of the argument the case law was not available when defendant filed the initial petition, defendant's motion argues that our supreme court decided *People v. Harris*, 2018 IL 121932, "the case wherein the Illinois Supreme Court concluded the emerging adulthood/proportionate penalties claim" was more appropriately raised in a postconviction petition, "only days before his own petition was filed" and defendant, being incarcerated, "could not have been aware" of that case. Defendant also argues cause for failing to raise this claim because "the science itself was still being developed in respect to emerging adults." Defendant's motion argues that our supreme court's decision in *People v. Clark*, 2013 IL 127273, wherein the court "held that a petitioner cannot show cause for filing a claim under the

proportionate penalties clause based on *Miller*[1], nor for issues in respect to intellectual disabilities," is distinguishable. Defendant's motion argues *Clark* is distinguishable because in defendant's case, unlike in *Clark*, the trial court "was not permitted to consider mitigating factors in sentencing" because defendant "received a mandatory sentence." Defendant argues he suffered prejudice from being unable to raise the claim, "as the trial court did not have the ability to consider mitigating evidence, including evidence in the form of the science of juvenile maturity and brain development, before the imposition of a mandatory sentence."

¶ 19    Defendant's motion also argues that defendant has newly discovered evidence of actual innocence in the form of "the report of Dr. Geoffrey Loftus, who would provide testimony which would go toward the credibility of the witness [Mr. Wortham.]" Defendant's motion argues that defendant was unable to bring the evidence to the court's attention prior to filing the initial petition because the "prevailing authority," *People v. Enis*, 139 Ill. 2d 264 (1990), "expressed caution and skepticism against the use of such testimony." Defendant argues that "*People v. Lerma*, which allowed for the greater admission of eyewitness identification experts, was not decided until 2016." Further, it was "not ineffective [assistance to fail] to present an eyewitness identification expert *** before *Lerna* was decided." Defendant argues that under *Enis*, expert testimony on eyewitness identification was commonly excluded, and not until this court's decision in *People v. Martinez*, 2021 IL App (1st) 190490, could defendant "reasonably proffer Dr. Loftus's report as new evidence of his actual innocence." Defendant argues that the evidence is likely to change the result on retrial because "the only solid evidence against [defendant] was

---

[1]    "*Miller*" refers to *Miller v. Alabama*, 567 U.S. 460 (2012), and subsequent case law concerning "the sentencing of juvenile and youthful offenders." *People v. Buford*, 2023 IL App (1st) 201176, ¶ 28.

the identification [by Mr. Wortham]," Dr. Loftus "opines that the identification *** was likely poor," and "the jury did not have the opportunity to assess the reliability of [Mr. Wortham's] identifications in the context of the scientific information." Defendant also notes that the trial court "denied admission of jury instructions involving the reliability of eyewitness memory." Defendant argues that had the jury heard expert testimony or jury instructions on the fallibility of eyewitness memory it "would have been reasonably equipped to evaluate in a reasonably informed and principled fashion the implications of the in-trial confidence that [Mr. Wortham] displayed in his identifications."

¶ 20    On August 23, 2023, in a written order the trial court denied defendant's motion for leave to file a successive postconviction petition.

¶ 21    This appeal followed.

¶ 22                                    ANALYSIS

¶ 23    This is an appeal from the denial of a motion for leave to file a successive petition for postconviction relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)).

> "The Act contemplates the filing of only one petition without leave of
> court. [Citation.] There are two bases upon which the bar against successive
> petitions will be relaxed: (1) where the petitioner can establish cause and
> prejudice for the failure to assert a postconviction claim in an earlier proceeding
> or (2) where the petitioner asserts a fundamental miscarriage of justice based on
> his actual innocence. [Citation.] Under either basis at this stage, we must accept as
> true all well-pled allegations that are not positively rebutted by the record, and we

may not make fact or credibility determinations. [Citation.]" *People v. Griffin*,

2024 IL App (1st) 191101-C, ¶ 27.

¶ 24 "Our review of the denial of leave to file a successive petition is *de novo.* [Citation.]" *Griffin*, 2024 IL App (1st) 191101-C, ¶ 27. "*De novo* consideration means that we perform the same analysis that a trial judge would perform." *People v. Cox*, 2024 IL App (1st) 230330, ¶ 46.

¶ 25                    PROPORTIONATE PENALTIES CLAUSE

¶ 26    Under article I, section 11 of the Illinois Constitution, commonly known as the proportionate penalties clause, "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11.

> "A defendant's sentence violates the proportionate penalties clause where,
> among other circumstances, the penalty imposed is 'cruel, degrading, or so wholly
> disproportionate to the offense as to shock the moral sense of the community.'
> [Citation.] [Our supreme] court has declined to set out a specific definition of a
> cruel or degrading sentence because, 'as our society evolves, so too do our
> concepts of elemental decency and fairness which shape the "moral sense" of the
> community.' [Citation.]" *People v. Clark*, 2023 IL 127273, ¶ 51.

"Emerging adult" defendants may raise as-applied proportionate penalties clause challenges to life sentences based on the evolving science on juvenile maturity and brain development. *Clark*, 2023 IL 127273, ¶ 87, *People v. Walker*, 2022 IL App (1st) 201151, ¶ 27 ("our supreme court has held that young adults may rely on the evolving neuroscience and societal standards underlying the rule in *Miller* to support an as-applied challenge to a life sentence"). In *People v. Harris*, 2018 IL 121932, ¶¶ 36, 48, our supreme court held the defendant's as-applied challenge

- 11 -

under the proportionate penalties clause to a mandatory *de facto* life sentence was "more appropriately" raised in a petition under the Act. An as-applied challenge to a criminal sentence based on the proportionate penalties clause requires an evidentiary record "relating to how the evolving science on juvenile maturity and brain development applies to [the defendant's] specific facts and circumstances" so that the trial court may make "factual findings critical to determining whether the science concerning juvenile maturity and brain development applies equally to \*\*\* [the defendant] specifically." *People v. House*, 2021 IL 125124, ¶ 29 (citing *Harris*, 2018 IL 121932, ¶ 40). The issue is whether the motion makes a showing of "cause" for defendant's failure to raise this claim in his initial petition.

¶ 27    "Cause" in this context is defined as " 'an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings.' " *Clark*, 2023 IL 127273, ¶ 46 (quoting 725 ILCS 5/122-1(f) (West 2018)). In *Moore*, our supreme court held that *Miller* does not provide cause for young adults or those with intellectual disabilities to raise proportionate penalties challenges in a successive postconviction petition. *People v. Moore*, 2023 IL 126461, ¶ 42. The *Moore* court found that Illinois has long recognized the reduced culpability of defendants with intellectual disabilities and the "special status of young adults, especially those subject to adverse influences, for purposes of applying the principles of the proportionate penalties clause." *Moore*, 2023 IL 126461, ¶¶ 40-42. The court stated,

> "*Miller* does not present new proportionate penalties clause principles with respect to discretionary sentencing of young adult offenders. Instead, defendant had the essential legal tools to raise his present proposed claim under the proportionate-penalties clause when he filed his previous postconviction petitions." (Internal quotation marks omitted.) *Moore*, 2023 IL 126461, ¶ 42.

¶ 28    Defendant argues that the motion and petition in this case establish "cause" because the "the legal basis for his claim was not available until *** Illinois courts *** extended [*Miller*] to emerging adults who show that the protections of *Miller* should apply to them." On appeal, defendant does not expressly repeat his argument that *Harris* was not available to him because our supreme court decided that case "only days before" defendant filed the initial petition. Rather, defendant argues that cases finding that *Miller* and its progeny, and the emerging science on juvenile brain development, do not provide cause to raise a proportionate penalties clause claim in a successive postconviction petition are limited to cases involving discretionary life sentences. Specifically, defendant argues that *Moore* is distinguishable from this case because the defendants in *Moore* received discretionary life sentences whereas defendant received a mandatory life sentence; and, according to defendant, "*Moore* specifically held that because *Miller* did not change the law applicable to *discretionary* sentences imposed on young adult offenders, it [did] not provide cause for [those defendants] to file their proposed successive postconviction petitions." (Emphasis added.) Defendant argues that *Miller* did change the law with respect to *mandatory* life sentences, and defendant's claim "arises under Illinois Supreme Court cases that extend *Miller*'s protections against mandatory life sentences, under the proportionate penalties clause *** to emerging adults ***;" thus, defendant argues, *Moore* is inapplicable.

¶ 29    The State responds defendant could have raised the proportionate penalties clause claim under *People v. Thompson*, 2015 IL 118151[2], and *Harris*, 2018 IL 121932, both of which

---

[2]    In *Thompson*, on which the *Harris* court relied (see *Harris*, 2018 IL 121932, ¶ 48), our supreme court found that,

involved challenges to mandatory life sentences on postconviction review, and that defendant's attempt to distinguish *Moore* fails because *Moore* was not "driven by [a] discretionary/mandatory distinction," so that distinction does not matter. In reply, defendant agrees with the State that "*Harris* illuminated a path for challenging his life sentence" but argues that because "*Harris* was issued only six days before [defendant] filed his initial *pro se* post-conviction petition," "it would be unreasonable to expect that [defendant] *** would be aware that *Harris* had been decided," and repeats the argument attempting to distinguish *Moore*.

¶ 30      In *Moore*, our supreme court was explicit in its statement that "[a]s *Miller* did not change the law applicable to discretionary sentences imposed on young adult offenders, it does not provide cause *** to file their proposed successive postconviction petitions." *Moore*, 2023 IL 126461, ¶ 44. Nonetheless, this court has considered, and rejected, defendant's argument that *Moore* does not apply where the life sentence is mandatory rather than discretionary. See *People v. Horshaw*, 2024 IL App (1st) 182047-B, ¶¶ 62-63 (*Horshaw II*). In *Horshaw II*, the defendant filed a motion for leave to file a successive postconviction petition that argued that his sentence violated the proportionate penalties clause and in support, the defendant "relied on 'previously unavailable science and social science research that has brought about a "change in law" regarding sentences of youthful offenders when there is evidence of "immature brain development" associated with youth.' " *Horshaw II*, 2024 IL App (1st) 182047-B, ¶ 23. The

---

"Although we have determined that defendant cannot raise his as-applied constitutional challenge to his sentence under *Miller* for the first time on appeal from dismissal of his section 2–1401 petition, defendant is not necessarily foreclosed from renewing his as-applied challenge in the circuit court. To the contrary, the [Act] is expressly designed to resolve constitutional issues, including those raised in a successive petition." *People v. Thompson*, 2015 IL 118151, ¶ 44.

defendant asked this court to "interpret *Moore* narrowly and hold that it does not apply to defendant[, who received a mandatory sentence of 66 years' imprisonment,] because *Moore* concerned defendants who received discretionary life sentences." *Horshaw II*, 2024 IL App (1st) 182047-B, ¶ 56. This court stated that it has adopted a broad interpretation of *Moore* "without exception." *Horshaw II*, 2024 IL App (1st) 182047-B, ¶ 57. The *Horshaw II* court found that,

> "this court rejected the defendant's argument that he had established cause for his
> successive postconviction on the basis that his mandatory natural life sentence
> was distinguishable from the discretionary sentence in *Moore*. [Citation.] There,
> we determined that the factual distinction between mandatory and discretionary
> sentences was irrelevant because a life sentence is a life sentence whether it is
> mandatory or discretionary and that *Miller*'s unavailability only deprived the
> defendant of 'some helpful support.' [Citation.]" *Horshaw II*, 2024 IL App (1st)
> 182047-B, ¶ 58 (citing *People v. Carter*, 2023 IL App (1st) 220491-U, ¶¶ 20-21).

¶ 31 This court held that the "[d]efendant cannot establish cause for his failure to raise his proportionate penalties claim in his initial postconviction petition because a proportionate penalties clause claim was always available to him in some form. [Citation.] As our supreme court has said, *Miller* was simply helpful support and not the basis for a new claim. [Citation.]" *Horshaw II*, 2024 IL App (1st) 182047-B, ¶ 63.

¶ 32 This court recently reiterated that "[a]ppellate panels in this district and the fourth district have reviewed this issue and rejected the contention that there is a relevant distinction between young adults who received mandatory and discretionary sentences." *People v. Hartsfield*, 2025 IL App (1st) 232389-U, ¶ 44 (citing cases). Similarly here, we find no basis to conclude that the holding in *Moore* applies only to defendants with discretionary life sentences. We have no need

to decide whether *Harris* was available to defendant at the time of filing the initial postconviction petition. As this court recognized, "the claim at issue in this case should be viewed as nothing more than an extension of proportionate penalties claims that have existed all along and that defendant did not need *Miller* or *Miller*-related proportionate penalties precedent to raise the claim now at issue." *Horshaw II*, 2024 IL App (1st) 182047-B, ¶ 62 (citing *People v. Dorsey*, 2021 IL 123010, ¶ 74, *Clark*, 2023 IL 127273, ¶¶ 92-93, *Moore*, 2023 IL 126461, ¶¶ 40-42, *People v. Hilliard*, 2023 IL 128186, ¶ 28). Defendant's argument that the petition establishes "cause" because "the case law which stated that a proportionate penalty claim in such instances was properly filed in a postconviction petition was not available at the time of the initial petition," fails.

¶ 33    Turning to defendant's argument that the motion and petition establish cause because "the science involved was still being developed and recognized by the courts," defendant argues that (1) a "white paper[3] on the science of late adolescence, published in 2021," and (2) "a developmental analysis conducted by Dr. James Garbarino, who interviewed [defendant] in 2019," attached to the successive petition "introduced new evidence that was not available when [defendant's] initial petition was filed in 2018." Defendant argues that newly discovered evidence in support of a constitutional claim satisfies the "cause" prong of the cause-and-prejudice test. The State responds the unavailability of more current research did not prevent defendant from raising his proportionate penalties clause claim in the initial petition since, the

---

[3]     "A white paper is a report or guide that informs readers concisely about a complex issue and presents the issuing body's philosophy on the matter. It is meant to help readers understand an issue, solve a problem, or make a decision." https://en.wikipedia.org/wiki/White_paper (visited March 29, 2025).

State argues, "in Illinois, developmental distinctions between adult, young adult, and juvenile offenders have been long recognized in the law." The State also argues this court has rejected a similar argument, that a report by Dr. Garbarino that was unavailable when an initial postconviction petition was filed, provided "cause." In reply, defendant repeats his argument that his exhibits attached to the successive petition "provided new evidence that was not available when [defendant's] initial petition was filed in 2018."

¶ 34     In support of its argument the State cites *People v. French*, 2022 IL App (1st) 220122. In *French*, the trial court denied the defendant's motion for leave to file a successive postconviction petition that alleged that the defendant's sentence violated the proportionate penalties clause because that defendant's sentence "was a *de facto* life sentence imposed on him as a 20-year-old." *French*, 2022 IL App (1st) 220122, ¶ 9. There, just as in this case, the defendant argued "that he established cause 'because his claim is based on recent, substantive developments in the law as well as newly-obtained factual support for the claim which could not have been brought in his first post-conviction petition.' " *French*, 2022 IL App (1st) 220122, ¶ 13. There, as here, the defendant "referenced a report from Dr. James Garbarino detailing [the] defendant's 'developmental pathway from childhood to adulthood' " which the defendant received after filing the initial petition. *French*, 2022 IL App (1st) 220122, ¶ 9. Just as here, the *French* court found the "[d]efendant relies on the evolving caselaw and scientific research regarding young adult offenders, which in turn led defendant to seek the report from Dr. Garbarino to substantiate his claim." *French*, 2022 IL App (1st) 220122, ¶ 25. In *French*, this court held that "[b]ased on

*Dorsey*'s clear holding[4], defendant cannot establish cause for his failure to raise his proportionate penalties claim in his initial postconviction petition." *French*, 2022 IL App (1st) 220122, ¶ 25. The *French* court considered the distinction between a "lack of supporting caselaw" and a "lack of evidentiary support." *French*, 2022 IL App (1st) 220122, ¶ 33. This court rejected that distinction as a basis for finding "cause" explaining, in sum, that "if the caselaw underpinning defendant's claim does not provide cause, then defendant's delayed investigation of the claim based on the lack of the caselaw cannot provide cause either." *French*, 2022 IL App (1st) 220122, ¶ 33. See also *People v. Haines*, 2021 IL App (4th) 190612, ¶ 51 ("new brain research *** is merely some helpful support alongside a 'law of nature' that the supreme court acknowledged more than a century ago. The emergence of some helpful support for a claim that already was raisable is not cause").

¶ 35    Defendant's reliance on *People v. Robinson*, 2020 IL 123849, ¶¶ 62-65, *People v. Blalock*, 2022 IL 126682, ¶ 44, and *People v. Mitchell*, 2012 IL App (1st) 100907, ¶ 75, does not lead us to a different result. In *Robinson*, with regard to witness affidavits (the court having found that the defendant's own affidavit was not newly discovered evidence), "the appellate court assumed the validity of the circuit court's finding that they satisfied the newly discovered and materiality elements of an actual innocence claim ([citation]), and the State [did] not challenge that determination here. Accordingly, [the court] review[ed] only the determination of

---

[4]    "[I]n *Dorsey*, 2021 IL 123010, ¶ 74, our supreme court held that '*Miller*'s announcement of a new substantive rule under the eighth amendment does not provide cause for a defendant to raise a claim under the proportionate penalties clause.' The court continued that '*Miller*'s unavailability prior to 2012 at best deprived defendant of "some helpful support" for his state constitutional law claim, which is insufficient to establish "cause." ' [Citations.]" *French*, 2022 IL App (1st) 220122, ¶ 25.

whether the evidence set forth in the affidavits *** was of such a conclusive character as would probably change the outcome on retrial." *Robinson*, 2020 IL 123849, ¶ 54. In *Blalock*, our supreme court rejected "the rule adopted by the appellate court *** that the factual basis of a claim of a coerced confession is always known to a defendant, that subsequent evidence of police misconduct is irrelevant to establishing cause, and a coerced confession claim can therefore never be raised in a successive postconviction petition." *Blalock*, 2022 IL 126682, ¶ 41. The newly discovered evidence in *Blalock* included evidence of a pattern and practice of abuse, affidavits from other alleged victims of abuse by the detectives at issue, and complaints about the officers. *Blalock*, 2022 IL 126682, ¶ 39. The court found that "newly discovered evidence of police coercion may, depending on the individual circumstances of the case, provide cause for permitting the filing of a successive postconviction petition." *Blalock*, 2022 IL 126682, ¶ 42. Our supreme court adopted the reasoning that, with regard to the particular type of evidence at issue, "the barriers to obtaining it are entirely 'objective'—that is, not of the defense's own making. [Citation.] So the defendant cannot be faulted for lacking this evidence at the start, and if it becomes available to him later, he may use it then in a successive petition." (Internal quotation marks omitted.) *Blalock*, 2022 IL 126682, ¶ 44. First, the *French* court specifically distinguished cases similar to *Blalock*, "where cause was established because newly discovered evidence surfaced that the defendants had no control over." *French*, 2022 IL App (1st) 220122, ¶ 33. Second, in this case, defendant has not demonstrated that the barriers to obtaining information about his own development were "entirely objective." Although defendant may now have the science to back it up (which only provided "some helpful support"), defendant could have summoned the facts about his own childhood experiences and history concerning his upbringing and development. Finally, in *Mitchell*, the court found that the defendant showed cause for

failing to present the affidavit of a witness who averred "that police used threats and intimidation to coerce [the witness] into committing perjury" because when the defendant filed the first postconviction petition the witness "had not admitted that he lied under oath." *Mitchell*, 2012 IL App (1st) 100907, ¶¶ 48, 65. This court has recognized that in such situations no amount of diligence would have permitted a defendant to obtain the evidence and, therefore, it was newly discovered. *People v. Ayala*, 2022 IL App (1st) 192484, ¶ 137. *Mitchell* has no application in this case.

¶ 36     We agree with the reasoning and conclusion in *French* that the defendant failed to establish cause "because the Illinois proportionate penalties clause existed long before he filed his initial postconviction petition and, thus, he could have raised the claim at that time" and "summon[ed] the evidentiary support." See *French*, 2022 IL App (1st) 220122, ¶¶ 33-34. We find that defendant failed to establish cause for failing to raise his proportionate penalties clause claim in the initial postconviction petition. Having found that defendant failed to establish cause, we have no need to determine whether defendant established prejudice. *People v. Guerrero*, 2012 IL 112020, ¶ 15, 22 (affirming trial court's denial of motion for leave to file successive petition where the defendant did not establish cause without addressing prejudice because "both elements or prongs of the cause-and-prejudice test must be satisfied in order for the defendant to prevail").

¶ 37     The trial court's judgment denying defendant's motion for leave to file a successive postconviction petition challenging defendant's sentence under the proportionate penalties clause is, therefore, affirmed.

¶ 38                              ACTUAL INNOCENCE

¶ 39    Defendant argues the petition states a colorable claim of actual innocence based on a report by an expert in eyewitness identification that "would substantially undermine the reliability of [Mr. Wortham's] identification." Defendant argues that the petition satisfies the pleading requirements for a successive petition based on actual innocence. "The elements of a claim of actual innocence are that the evidence in support of the claim must be 'newly discovered;' material and not merely cumulative; and of such conclusive character that it would probably change the result on retrial." *People v. Edwards*, 2012 IL 111711, ¶ 32.

> " 'New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence.' [Citation.] 'Material means the evidence is relevant and probative of the petitioner's innocence.' [Citation.] To be material, the evidence 'need not, standing alone, exonerate the defendant; rather, it must tend to "significantly advance" his claim of actual innocence.' [Citation.] 'Noncumulative means the evidence adds to what the jury heard.' [Citation.] Conclusive means that the additional evidence, 'when considered along with the trial evidence, would probably lead to a different result.' [Citation.] 'Probability, not certainty, is the key ***.' [Citations.] A piece of new evidence is conclusive if it 'would probably change the result on retrial, either by itself or in conjunction with' other new evidence also presented by the petitioner. [Citations.]" *People v. Cox*, 2024 IL App (1st) 230330, ¶ 44.

"Our supreme court has 'specifically rejected the total vindication or exoneration standard ***.' [Citation.]" *Cox*, 2024 IL App (1st) 230330 ¶ 44 n8.

¶ 40    Notwithstanding defendant's argument on direct appeal that trial counsel provided ineffective assistance by failing to present testimony from an expert in eyewitness

identifications, defendant argues the evidence in support of the successive petition "was neither presented, nor available, at the time of [defendant's] direct appeal." Defendant argues that is so because "that argument [on appeal] dealt with the possibility of hypothetical expert testimony and focused on trial counsel's performance," whereas this argument "seeks to present entirely new evidence in the from of a written report from an expert who reviewed the evidence *** and concluded that the *** identification[] was 'poor at best.' " Defendant argues that Dr. Loftus's report is "newly discovered" because (1) it was not written prior to trial and (2) even if Dr. Loftus had been engaged to opine on Mr. Wortham's identification prior to trial, "the prevailing case law" likely would have resulted in its exclusion.

¶ 41    Defendant also argues the report is material and noncumulative because "the jury heard no evidence about the science of eyewitness identifications" nor was it instructed on the fallibility of eyewitness memory. Defendant argues the report would probably change the result on retrial because evidence undermining the identification would place the evidence in a different light "where the State produced very little other evidence of [defendant's] guilt."

¶ 42    The State responds the evidence is not newly discovered because the facts of the identification were known prior to trial and defendant knew of the possibility that an expert could have been called to question the reliability of the identification, regardless of whether the evidence was likely to be admitted; and the State argues the "report is not so conclusive it would probably change the result on retrial" because (i) other courts have rejected Dr. Loftus's opinions and (ii) the State produced evidence of defendant's guilt other than Mr. Wortham's identification at trial. In reply, defendant concedes the facts surrounding the identification were known prior to trial arguing instead that "in some situations, evidence that is known to a defendant at the time of trial can nonetheless be considered unavailable and, therefore, newly discovered for purposes of

an actual innocence claim." Defendant's reply also argues that defendant "made at least a colorable showing that Dr. Loftus's report is of a sufficiently conclusive nature that it would probably change the result on retrial" because there were other explanations for physical evidence linking defendant to the murder.

¶ 43    Claims of actual innocence are subject to *res judicata*. *People v. Munoz,* 406 Ill. App. 3d 844, 851 (2010) ("Unlimited 'piecemeal' petitions couched in terms of actual innocence are not available because the preclusion doctrines of *res judicata,* collateral estoppel, and the law of the case remain after [*People v. Ortiz,* 235 Ill. 2d 319, 330 (2009)] to preclude petitions that do not support a new 'claim.' "). "It is well established that [in postconviction proceedings,] 'where an appeal was taken from a conviction, the judgment of the reviewing court is *res judicata* as to all issues actually raised ***. [Citations.]" *People v. Gaines*, 105 Ill. 2d 79, 87-88 (1984). "[T]he Post-Conviction Hearing Act was not intended to be used as a device to obtain another hearing upon a claim of denial of constitutional rights where there has already been a full review of the issues raised. [Citation.] Nor can this policy be defeated by rephrasing previously addressed issues in constitutional terms when raising them in the post-conviction petition." (Internal quotation marks omitted.) *Gaines*, 105 Ill. 2d at 90. We find that, as it pertains to Mr. Wortham's identification of defendant, Dr. Loftus applied the same "aspects of perception and memory" that this court considered in *McGee I* to "discuss[] the identification of [defendant] by [Mr. Wortham.]" We resolved those claims, "however much to defendant's dissatisfaction," in *McGee I*, and that decision "must not be ignored." *Haines*, 2021 IL App (4th) 190612, ¶¶ 18, 22 (quoting *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 63).

¶ 44    In opposition to finding defendant's claim of actual innocence barred by *res judicata*, on appeal defendant argues that the petition does "not attempt to relitigate the question of trial

counsel's effectiveness on the issue." Rather, the petition "seeks to present entirely new evidence" that was "neither presented, nor available, at the time of [the] direct appeal."

¶ 45     We disagree with defendant's position that the petition presents a new claim based on "entirely new evidence." On direct appeal, defendant argued that the State failed to prove defendant guilty beyond a reasonable doubt because, based on several factors impacting identifications, Mr. Wortham's identifications were unreliable. *McGee I*, 2017 IL App (1st) 150838-U, ¶ 3. The claim made in the proposed successive postconviction petition is that defendant is actually innocent because an expert would testify that Mr. Wortham's identification of defendant was "poor at best" because certain factors negatively impacted the reliability of Mr. Wortham's identification of defendant from a photo array, lineup, and in court. Defendant argues that Dr. Loftus's report could not have been presented at trial because it did not exist. Defendant also argues that Dr. Loftus's report could not have been presented at trial "because the prevailing caselaw at the time would have excluded it."

¶ 46     As for the substance of the report, defendant asserts that defendant's eyewitness expert's report presented "general information about the fallibility of eyewitness identifications" as well as a discussion of Mr. Wortham's identification of defendant. Defendant claims that, according to the report, "research has found both that 'a highly confident eyewitness can be quite persuasive to a jury,' and that, for various reasons, 'a confident witness need not be an accurate witness.' " Defendant states that, per the report, some of the factors affecting Mr. Wortham's identification were "the poor lighting conditions, the stressful circumstances of the incident, and the need for [Mr. Wortham] to divide his attention to protect himself and others." Defendant asserts that based on these factors, Dr. Loftus concluded that Mr. Wortham's "memory of the offender would likely have been poor at best when he made his identification." Defendant argues

that "[i]f called to testify, Loftus would have discussed these facts and 'the non-standard nature' of the photo array administered to [Mr. Wortham] hours after the shooting, as well as 'potential bias against [defendant] in the photo lineup *** [and] the live lineup.' "

¶ 47    In defendant's direct appeal, this court wrote, "Defendant argues the circumstances under which [Mr. Wortham] observed the man standing on the passenger side of the car, the fact only one other person in the photo array matched his initial description of that man, and that only one person was in both the photo array and physical lineup render [Mr. Wortham's] identification of defendant unreliable and raise a reasonable doubt of his guilt." *McGee I*, 2017 IL App (1st) 150838-U, ¶ 16. We also noted that, "Defendant argues [Mr. Wortham] had a limited opportunity to view the man standing by the car. Defendant also argues there is no evidence [Mr. Wortham] ever saw defendant before and there is a greater danger of misidentification when a witness identifies a stranger based on a brief observation." *McGee I*, 2017 IL App (1st) 150838-U, ¶ 16. Further, in *McGee I*, "Defendant also argue[d] the presence of a weapon negatively impacts a witness's ability to make a reliable identification, and [Mr. Wortham's] attention was more focused on the Floyds and particularly on Brian Floyd, who was armed." *McGee I*, 2017 IL App (1st) 150838-U, ¶ 20. And, "Defendant attacked the weight to be given [Mr. Wortham's] identification by arguing courts have repeatedly noted that there is a low correlation between a witness's confidence in an identification and the accuracy of that identification." *McGee I*, 2017 IL App (1st) 150838-U, ¶ 21. Defendant also "argue[d] the fact [Mr. Wortham] 'could only provide a bare-bones description of the man he later identified as [defendant]' 'casts doubt on the accuracy of his identification of [defendant.']" *McGee I*, 2017 IL App (1st) 150838-U, ¶ 22.

¶ 48    As to the "prevailing law," we note that, despite *Lerma*'s recognition that "the exclusion of such testimony [was] the common practice in Illinois" (*Lerma*, 2016 IL 118496, ¶ 24), the

court found it "important to reiterate that, even in [*Enis*, 139 Ill. 2d 264,] this court recognized that eyewitness identification is an appropriate subject for expert testimony." *Lerma*, 2016 IL 118496, ¶ 28.

¶ 49     Regardless, in *McGee I*, this court considered defendant's argument that " 'studies show jurors tend to rely on a witness's confidence in her identification as a guide to accuracy, but that there are low correlations between the witness's confidence and the accuracy of her identification.' " *McGee I*, 2017 IL App (1st) 150838-U, ¶ 21. We did not reject that argument based on the inadmissibility (or improbable admission) of such expert testimony but rejected it based on the primacy of the *Biggers* factors.[5] *McGee I*, 2017 IL App (1st) 150838-U, ¶ 21. *Lerma*, which had already been decided but which we did not cite, does not change that analysis. See *Lerma*, 2016 IL 118496. Defendant argues that Dr. Loftus's report "discussed 'the scientific bases of various relevant aspects of perception and memory.' " This court considered how the factors Dr. Loftus identified, in light of scientific studies (*McGee I*, 2017 IL App (1st) 150838-U, ¶ 21), impacted the jury's consideration of Mr. Wortham's identification and rejected every one of defendant's arguments. See *McGee I*, 2017 IL App (1st) 150838-U, ¶¶ 16-24.

¶ 50     We find that the addition of the expert's report does not result in a "new" claim. See *People v. Evans*, 2017 IL App (1st) 143268, ¶ 31 (and cases cited therein) (where the court stated

---

[5]     "The factors are:

'(1) the opportunity the victim had to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) *the level of certainty demonstrated by the victim at the identification confrontation*; and (5) the length of time between the crime and the identification confrontation.' [Citation.]" (Emphasis added.) *McGee I*, 2017 IL App (1st) 150838-U, ¶ 16.

that the affidavits in support of the actual innocence claims in *Evans* "bear only on the sufficiency of the evidence" and the defendant "already advanced—and lost—a sufficiency of the evidence argument in his direct appeal," the court found "we could dispose of the issues in this appeal *** on *res judicata* grounds").

¶ 51 We recognize that a defendant claiming actual innocence is excused from showing "cause." *Ortiz*, 235 Ill. 2d at 331-32. Nonetheless, the evidence in support of a claim of actual innocence must be "newly discovered." *Id.* Evidence is not "newly discovered" if it could have been discovered and presented prior to trial through the exercise of due diligence. *People v. Smith*, 2024 IL App (2d) 230539, ¶ 56. In *Smith*, the court found that expert reports were not "newly discovered evidence" for purposes of an actual innocence claim where the affidavits were "based on evidence and information that was available at the time of trial" and the "defendant's trial counsel made the strategic decision not to call any expert witnesses." *Smith*, 2024 IL App (2d) 230539, ¶ 57. We have already found that defendant's trial counsel's failure to call an expert to support the attack on Mr. Wortham's identification was not unreasonable. *McGee I*, 2017 IL App (1st) 150838-U, ¶ 30 (finding that despite the absence of expert testimony, "[d]efendant's attorney subjected the State's case to meaningful adversarial testing through cross-examination and argument on the issue of identification").

¶ 52 Regardless, our holding is based on *res judicata*. We find that defendant has rephrased the previously adjudicated claim that the State failed to prove defendant guilty beyond a reasonable doubt because Mr. Wortham's identification was unreliable (*McGee I*, 2017 IL App (1st) 150838-U, ¶ 3) as a constitutional claim of actual innocence because Mr. Wortham's identification was unreliable. These matters have been "definitively ruled upon" by this court. See *People v. Beard*, 2023 IL App (1st) 200106, ¶ 48 ("preclusion should only apply when the

evidence has been previously considered and definitively ruled upon"). Thus, "[t]he doctrine of *res judicata* bars defendant's successive petition for postconviction relief." *Haines*, 2021 IL App (4th) 190612, ¶ 22, see also *LaPointe*, 2018 IL App (2d) 160903, ¶¶ 62-64 (finding that where substance of postconviction claim was rejected on direct appeal that claim is barred by *res judicata*). The trial court's judgment denying defendant's motion for leave to file a successive postconviction petition claiming actual innocence is, therefore, affirmed.

¶ 53                                      CONCLUSION

¶ 54    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 55    Affirmed.